Here to ye, here to ye, this Honorable Appellate Court of the 2nd Judicial District is now back in session. The Honorable Robert D. McClary, the presiding judge. Please be seated. Your Honor, the second case on the docket this morning, 2-22-0339, is now the A'Quino plaintiff appellate v. Mark S. Hall, defendant's appellate. Arguing on behalf of the appellate, Ms. Lynn Dowd. Arguing on behalf of the appellate, Mr. Anthony Richard Oswald. Thank you. Ms. Dowd, you may proceed. Thank you, Your Honors, and good morning. For the record, my name is Lynn Dowd, and I am here today with my co-counsel, Matthew Leonard. And I represent the plaintiff, Ismael De'Aquino. May it please the Court. Your Honors, we respectfully submit that the Circuit Court erred in entering summary judgment in this case for four reasons. We have four theories of liability, and they are as follows. One is predicated on the various leases between the parties. The Will County Ordinance, the duties the defendant had as the admitted property manager of the property, and lastly, and alternatively, that he engaged in a voluntary undertaking to maintain these premises. Your Honors, I would like to start my argument dealing with the Will County Ordinance, because I think that presents an irrefutable point of law that the defendant cannot overcome. In effect, both in the year 2000, therefore in 2001 when the first lease was entered, and then again as amended in 2012, which applied to the 2017 period when the incident occurred, the Will County Ordinance contained therein the International Building Code, the International Property Maintenance Code, and various other codes that we've cited for the Court's convenience. Under the Will County Ordinance, the code applies plainly and directly to the owner of the property. It also applies to the occupant, but the ordinance sets forth non-delegable duties for the owner of the property, and that's this defendant, and they are as follows. That with respect to any building or equipment therein, or fixtures or trade fixtures, this defendant had an obligation when he first leased the property to Mr. Parita, and therefore there was a change in the property. There were alterations to customize it to his automotive shop to get permits. Let me just ask you a question. Yes, sir. The Hall property is in the City of Naperville. Correct. How does the Will County Ordinance apply to that property? It's in that section of Naperville that's in Will County. I know that, but so the Will County Ordinance applies to municipal properties within the boundaries, or does it apply only to unincorporated areas? I believe it applies to both, Your Honor. It does? Yes. So if Cook County, for example, has an ordinance for unincorporated areas overseeing, you know, whatever, fire extinguishers, that applies not to the City of Chicago's? I understand your question, and as a resident of Naperville who also practices real estate law, I think that would be— Is that just a question? Yes. I don't know the answer to that. I'm asking the question because of comments. I'm a state's attorney in DuPage County, and ordinarily county ordinances apply to unincorporated areas. Your Honor, I can answer that question because Naperville also does have a code, a building code, which does incorporate the same international building codes. So at this, you know, whether it's the Will County Ordinance or the Naperville Ordinance, they do encompass the International Building Code, International Property Maintenance Code, International Electric Code, and that's all of record. You know, it's a matter in the public record. I think you just conceded that the ordinance applies to owners and occupants. It applies to both. There's concurrent duties, and that's the whole point. The defendant's position is that because he leased the property to Mr. Parida, he had no obligation to do anything, and that's just not correct. And we know that because of our Supreme Court has spoken on this issue. Back in the Deeney decision, the Wright v. Mr. Quick, you know, all of these decisions, well, starting with Deeney and that particular case, the Supreme Court laid out the five exceptions. Like as a general rule, when a property is leased to a third party, the landlord gives up control of the property and therefore has no more duties. However, one of the express exceptions is when there's an ordinance or other statute that is implicated, and that's what we have here. That trumps that general rule. And so that brings us to the Will County Ordinance, or even if we have to look to the Naperville Building Code. What exactly is the ordinance supposed to be overseeing, checking, or inspecting? Public safety, Your Honor, is of paramount importance. That's what it's all about, especially when we're dealing with commercial properties and properties with industrial equipment. Public safety is of paramount importance. And so Will County and Naperville have promulgated laws to ensure that it's not just the tenant who is complying with the laws but the owner, because the owner doesn't have to rent this property to these types of commercial properties.  For purposes of inspection for safety, what is the source by which the measurements are made? Is it the building code or is it just exactly what is it? I mean, is it the general reasonable man theory that you don't put, you know, a bunch of knives within reach of children or something like that? Or is it actually, you know, a page section in a paragraph or whatever? It's the actual code itself. The Will County Ordinance, and I'm just going to shorten out whether it's the Naperville Code, they're really the same because they encompass the International Building Code and the International Property Maintenance Code. They have a detailed list, a detailed delineation of specifications that every owner of a building must comply with. And the mechanism to trigger that is the permit process. First, when there's the build-out of the property, but then when there's any installation of heavy equipment, electrical systems, plumbing systems, it goes on and it's very, very specific for what needs to be permitted. Is the definition of owner definitive insofar as it delimits owners of real estate or does it also include owners of equipment? Well, my read of the applicable codes is that it delineates the owners of the property, the premises, and then it defines the duties with respect to what happens within the four corners of those premises, and it's as follows. There's a duty to maintain the equipment therein. There's a duty to ensure that the use and occupancy of those premises are safe. There's a duty to maintain those premises, which is broader than just the equipment, and any use or occupancy the owner allows in violation of the four corners of these laws is strictly prohibited. So the facts of this case demonstrate at all relevant times Mr. Hall was in violation of the applicable laws. How would Mr. Hall have known that the lift was not being repaired or that it was in a non-useable condition? Well, I have two answers to that, Your Honor. First, we have facts of record that he had actual knowledge. I know you made reference to a comment that he made at one point in time, correct? Well, it was more than a comment. Mr. Aquino testified in his deposition that Mr. Hall came into the property approximately a month before the incident and observed something wrong with the lifts. He pulled Mr. Perita, the owner of the business, over, and they had a lengthy discussion about this. Mr. Hall left, and then nothing was done. Mindful that this case is subject to the Pedrick standard, a jury could reasonably conclude that Hall observed these lifts were defective, brought it to the owner's attention, but then he did nothing. He did nothing to follow up? The law in the State of Illinois is pretty clear that landlords generally do not owe a duty of care for injuries on a leased property. You would agree to that? Absent an ordinance violation, yes. And the cases cited by the defendant in support of their position do not deal with ordinance violations. Our Supreme Court is very clear. When you say ordinance violation, are you referring to the failure to obtain a permit, or are you talking about an ordinance violation where the ordinance says something shall be affixed with bolts that are of sufficient tensile strength that whatever lift is attached to the floor will not come out of the ground? I'm talking about several violations, Your Honor, one being the failure to get a permit, and the experts explained why that was important. Because had they gotten permits at the inception of the build-out, and then later when additional lifts were brought in and that required additional permits, that would bring the code compliance officer back to inspect the premises, and the condition of those lifts was such, according to the unrebutted expert testimony, that the code compliance officer would have found them to be defective and dangerous, would have condemned them, ordered the property and the business shut down until those lifts were brought into good working condition. But also the other violations deal with Mr. Hall's failure and violation of the ordinance to keep the property in safe condition, the equipment, and how could he do that? Annual inspections, semi-annual inspections, this was easy. He could have required that his tenant have professional inspections of his equipment, just like we do with elevators in the city of Chicago, and that we get a professional certificate. If I understand your position, you're suggesting, tell me if I'm wrong, it is your position that the landlord, under the ordinance, was required to seek a permit on any piece of equipment on the property and find out whether the equipment was properly maintained or installed, and then what was supposed to happen? Was the landlord supposed to make the repairs and the maintenance and charge the tenant? Does what the paragraphs in the lease might say or not say have any relevance or materiality since you're speaking in terms of a duty based upon an ordinance or a statute? And if the tenant is unwilling or unable to either compensate or carry out the required maintenance, that there is or there is not a breach of the lease such that the tenant can be evicted based upon a breach of the lease, as well as breach of the ordinance, because doesn't it say owner and occupant or occupant? Not quite, Your Honor. Our position is that the ordinance renders the leases legally irrelevant. That's a whole separate theory of liability that I'm prepared to discuss. The ordinance requirement stands on its own. It's the law. And the law says the owner must do X, the occupant must do X. They each had a duty imposed by law. Well, they're jointly and severally liable except when you have workman's comp getting implicated. I'm sorry, Your Honor. So you're saying that the owner and the occupant are jointly and severally liable under the ordinance except for the fact that this is a workman's comp case, is it not? That's correct. And so therefore, the occupant wouldn't be liable, am I correct or not? Unless by a third party complaint for contribution vis-a-vis through the owner, yes. But the plaintiff sued the owner directly pursuant to his legal violations of the ordinance. Was there a third party complaint in this case? Yes. For contribution? Yes. Yes, there was. So in any event, the bottom line here, Your Honor, is we have, if I could just reference the Collada decision from the early 1990s, that's our Supreme Court saying a violation of a statute, ordinance, or other applicable law is prima facie evidence of negligence. Now, we know that's rebuttable, but that's the law. So the ordinance violations that Mr. Hall committed render him liable in negligence. It's that simple. How do we prove that up? We brought in experts who did their examination and inspection of the equipment, and they delineated in great detail how Mr. Hall violated those ordinances. And this is actually permitted. And this is the vehicle how we bring in this evidence. Under the Filippetto decision that I've cited, that's exactly what happened here. The expert came in and read the ordinances into the record and then explained factually what happened and how those were violations. Now, the jury is, of course, the ultimate fact finder. But the expert is allowed to give expert opinions on the deviations with respect to those ordinance requirements. And so we have proven that up factually and overwhelmingly. Counsel, I want to get back to the duty arising under the ordinance. So obviously the ordinance requires an inspection before installation or upon installation. What in the codes that you cite specifically imposes on an owner a duty to ongoing maintenance and inspection of trade fixtures within a portion of the property that is not common area or exterior or otherwise assumed by lease to be the owner's responsibility? Okay. I can refer you, Anna, to, it's quite extensive, the violations. And they commence on pages 1368 in the record. And that's where Mr. Hudson delineates the applicable codes and all the violations therein. And then again, if I may just finish my sentence, Your Honors, Mr. Heath, his testimony on page is 1371. It's very, very detailed. And for the court's, you know, the circuit court and the reviewing court's convenience, they've identified in detail chapter and verse of the ongoing duties of the owner with respect to the interior, the exterior, the equipment, the permitting process, the follow-up, everything that, and they also provide proximate cause testimony. Had Mr. Hall complied, a compliance officer would have found this equipment to have been dangerous and defective, would have condemned it, and this catastrophic injury would not have happened. One quick question on that, the inspection protocol by the code enforcement, are you saying that that did not occur because the initial permit was never applied for? That's correct. That's what triggers the whole process. That's how the law is set up, whether it's commercial or residential property. The county doesn't go around peeking in windows. They have to be put on notice, and that's the requirement to ensure public safety. If there are no other questions, Your Honors. Yes, sir. Justice Marquette, I think you've answered it. I mean, essentially your argument is that the code-slash-ordinance trumps the lease. Yes, but the lease is an additional ground for liability, as we've set forth in our brief. Thank you very much for your time. Well, I have a similar question to Justice Marquette's. It seems to me, and you can clarify my ignorance if I'm wrong, it seems like there's a conflict between tort law relating to who is responsible when there is a lease involved and possession of the premises is given over to someone other than the landlord, and when there is an ordinance, as you pointed out, that suggests what you've argued, that there seems to be an inconsistency, a contradiction, or a lack of conciliation, or whatever, relative to which one we are supposed to determine is the one that predominates. And you're arguing that it should be the ordinance rather than the established case law relating to essentially a duty that usually is based upon control and possession of equipment or real estate if, in fact, that was the proximate cause of the injury, with an ordinance that seems to place a responsibility on someone who, under landlord-tenant law, isn't necessarily in control of the property that the proximate cause of injuries came about from. So am I correct that this is what we're dealing with here in the bottom line? Again, not quite, Your Honor. Respectfully, I submit there's no conflict in the law. Like many, many laws, we have a general rule and there are exceptions. The general rule is what we call landlord immunity, and I could refer the Court to that Klitska decision. That was a dog bite case, and if I rent my home to some tenants and their dog bites a third property, I'm not liable. Why? Because there's no ordinance violation with respect to me, the landlord. One of the five delineated exceptions from our Supreme Court is when there's an ordinance violation. That supersedes that landlord immunity rule. That goes out the window. The ordinance violation is first and foremost because that's the law promulgated by the governmental entity versus a private party's contract. Private parties can't contract away their legal obligations under the law, and this ordinance was very clear. If the defendant didn't want to comply with the requirements for his commercial properties, he could get out of the commercial property business or not rent to an automotive repair shop. He could rent to lawyers and accountants, people who push pencils and push keyboards, and it's not as big of a risk. But when he allowed heavy equipment to come into his property, the law mandated certain obligations, and he didn't comply with them, and those are the facts of record. I guess there's no further questions. You'll have an opportunity to make your vote. Thank you very much. Thank you. Mr. Riccirovato, you may proceed. Thank you. Good morning, Mr. Clark. Good morning. May it please the Court. Counsel. My name is Anthony Riccirovato, and I represent Mark Hall, and we're asking this Court to affirm the lower court's decision in favor of Mr. Hall, and I'm going to talk right away about there is no evidence of any ordinance that was in place in Will County at the time that these lifts were installed. And I want to point out that, Your Honor, Justice Burkett was correct in that Section 150.003 deals with applying for permits with Will County concerning buildings, but only when those structures are outside of a municipality. So this structure is in Naperville, so there would not have been any Will County permit that needed to be pulled or obtained. What's your response to Ms. Dowd's statement that Naperville had a similar ordinance? Well, how do we know that? We're presenting the record. There's not a single mention of any Naperville ordinance or Naperville code or what they adopted or when they adopted it. And as we see, Your Honor, if we look at Mr. Hudson's affidavit, we'll see that this is trickery if you look at it very closely. Because let's follow the timeline. According to Heath, Mr. Heath, who's an expert in lifts, opines that somehow everything in the Sparks leasehold became my client property as of 2001 when he moved in, especially the lifts. Heath opines, I don't know how he has the foundation to do it, but Heath opines that the lifts become Mark Hall's as of the date that they're installed in 2001. Well, were those lifts actually someplace else? Yes. Two of them were moved from Mr. Parada's prior location on Route 59. They were bolted to the floor and they were connected to the electrical panel. He disconnected them and he moved them and he did the same thing at this property. So they're a personality rather than a fixture? You're a couple steps ahead of me, Your Honor, and that is all of the cases that counsel cites in their brief, none of them deal with an item of personal property owned by the tenant. None of these code violation cases involve personal property or trade fixtures that are owned and installed by the tenant. That's the crucial pivotal fact here, that all the testimony between the two parties to the lease, Mr. Parada and Mr. Hall, all their testimony is, and this goes to the case law interpreting trade fixtures, there's too many things. There's the intent between the parties and when the trade fixtures were installed. The intent between the parties is clearly outlined in all of their testimony. The intent was that these are trade fixtures, he never intended to leave them, and he's still there to this day, still there. So going back to Hudson's trickery, I call it trickery, because the only evidence that Will County adopted any of these standards that counsel was talking about was when they adopted them in 2014. So Will County adopted the NEC and International Property Maintenance Code, Will County adopted them in May of 2014. There's no evidence that Will County adopted any of these standards before May of 2014. I've searched their records, there's nothing cited in the plaintiff's brief, nothing cited in any of their experts' affidavits. Did you ever ask for freedom of information disclosure? No, no, I did not. Or any standards prior to 2014? Well, no, I did not, Your Honor. But this ties in with one of the reasons why Hudson's affidavit was stricken, is because Hudson did not provide any evidence, any written attachments to his affidavit indicating that Will County had passed a code that adopted these standards at the time that the lift was installed. There's no evidence that the NEC standard... Did he give any date whatsoever? No, he did not. He said prior to 2014, Will County had adopted the 2000 IBC and NEC, but he doesn't cite how earlier than 2014. That's right. He doesn't state when it was. It's conclusory, another reason why the judge struck it. Well, yes. Prior to, I'm sorry, Your Honor. It's more ambiguous than conclusory. Prior to 2014, but not prior to 2001. So how is someone in 2001 to know what Will County standards, what Will County is going to adopt in 2014? It's a ludicrous argument to say that Mr. Hall somehow has a responsibility to get a permit based upon a 2012 and a 2011 standard that were adopted by Will County in 2014. Where's the evidence? There's nothing in this record showing when Will County adopted, first adopted the NEC or the International Property Maintenance Code. Well, isn't it more relevant to say that there's no evidence in the record to indicate what the effective date was and whether it was before or after the alleged period in which there was a duty allegedly to seek it? Correct, Your Honor. But they're here arguing that the trial court erred and the trial court made its decision based upon the documents that their two experts submitted. Their two experts did not submit a single code, any evidence of any code that was passed establishing that these standards were applicable at the time that the lift was installed. But there's something even more fatal here, and that is in Heath's affidavit he testified that somehow when these lifts were installed in 2001 that they became property of the owner of the building. And so by default he concludes that my client Mark Hall was the owner of the building and that by default these were now alterations to the building and being the owner of the building they became his property and now he's got a responsibility to maintain them. It stretches the imagination. Do you imagine that he could then have unbolted them and sold them at auction? Absolutely. And that's another point is that Mr. Parada, I guess Mr. Parada could be in fear of the fact that he's going to He runs the risk of losing $50,000 worth of automobile lifts in his place of business because some outside non-party to the leases is arguing that terminal holder property is Fox. They're not property of Mr. Hall. I think Mr. Parada would be very disappointed to learn that. But the most crucial thing here is that Mr. Hall did not even own the building in 2001. So when you read Heath's affidavit, he says, well, these were installed and became alterations in 2001 and Hall owned the building in 2001, but the record does not reflect that Hall owned the building in 2001. Hall purchased the building in 2003. Well, was there any connection with Hall in 2001 with the property? He was the landlord, but he was not the owner. And the crucial When you say landlord, do you mean he was the manager of the property? He rented the entire parcel of property with the other And then he subleased it to other parties? Yes. I see. So he was not the owner. And if you follow Heath's analysis, the title of these lists transferred to the owner of the property on the day that they were installed, and they've never been transferred to anyone else since then. That's his affidavit, Your Honor. But if you look at I have the citations. Wouldn't the contract of sale or the bill of sale be relevant for purposes of determining if the third party was the owner or whether Mr. Hall was the owner? What do you mean by that? Well, you tell us that he was merely a lessor of the property. Correct. And then he bought it in 2003. When he bought the property in 2003, did he buy everything that was there? Or, in other words, what did the bill of sale look like? He bought That's not in the record. It's not in the record. But Heath testified in his affidavit. Okay. So Hall did not own the building until 2003. It's in the record at page C-344 and C-345. And at the time that Sparks moved in, in 2001 and 2002, the building was owned by VSK Partnership. And that appears in the record at C-1758. So I'm only applying the opinions offered by the plaintiff's expert, Mr. Heath, who says that these lists transferred title to the owner of the property in 2001. The owner of the property was VSK Partnership. And Heath testified that he has not seen any documents that reflect that the transfer of the ownership of those lists had been assigned to anybody else. Those are not opinions of my expert. Those are opinions of the plaintiff's expert. I want to talk a little bit. Do your honors have any other questions on this topic? Because there is, Mr. Hudson makes it sound like the NEC and IBC standards were part of the code in 2014, or at the time of the installation. But if you look at paragraph 4 of his affidavit, nowhere in paragraph 4 does he set forth a Will County code that clearly delineates that it adopted the 2000 IBC or the 1999 NEC. So we're left with a record where these are just standards that existed at the time the lift was installed. But they were not adopted as code, which is crucial to their argument. Their argument is that this is an alleged violation of a code. But these were only standards at the time. They were not part of the code. I want to talk a little bit in support of the striping of the expert's affidavits. Because it's clear now why the lower court did it. Because how does an expert on lifts have a foundation to opine that title transfers from a tenant to a landlord? He's got no foundation to say that. But also with respect to Heath, I'd like to point out to the Escher v. Moorfolk and Western case, 77-3-976, and it has to do with subsequent inspections of property that allegedly caused an injury to the plaintiff. And in Escher, the case went to trial resulting in a plaintiff's verdict. And the plaintiff had called an expert that looked at this door, which was the subject of the occurrence. The plaintiff called an expert that examined the door three years after the fact and offered up opinion testimony at trial on how all the bad things he found with the door during his exam. But there was no testimony showing that the conditions that he observed three years after the fact were the same conditions as they were on the date of the accident. And that's exactly the problem that they have with Heath here. Because Heath looked at this lift approximately a year and a half after the incident occurred, and there was absolutely no testimony establishing that the conditions that he saw or observed in April of 2019 were the same conditions that existed with respect to the lifts in October of 2017. I'm sorry, I forgot the date of the loss. It's the gist of your argument that the foundation wasn't properly made. He's speculating. It lacks foundation and speculation. And it's conclusory. He's concluding that what he saw during his inspection was the same as what existed on the date of the incident. But we also know that can't be true. We know that can't be true, that the conditions that he observed in April of 2019 were drastically different than what the conditions were of the lifts in December of 2018. In the record at C18 through C1813, I'm sorry, 1813 through C1820, there are a series of auto lift inspection tickets. There's 16-point inspection. Like when you bring your car in, they give you these. It's a 16-point inspection of the lifts. They were performed on December 3, 2018 by an inspector named Bill Hills from Illini Auto Lift. And he inspected all of the lifts on the premises. And in all of those 16-point inspections, he found nothing wrong with them. So somehow clearly between December of 2018 and April of 2019, the conditions of some of these lifts changed. So Mr. Heath did not observe conditions that existed at the time of this accident. And if I may, just one more minute, if I can bring up one last thing. Is that okay, Your Honors? Yes. And it's on the issue that was raised in the reply concerning parole evidence. And that because the leases supposedly are clear, that we shouldn't consider the testimony of Mr. Hall and Mr. Parada. And in the reply, they mentioned for the first time that their testimony should not be allowed and should be barred based upon parole evidence. And I wanted to say that the parole evidence rule has absolutely no application to this case. The parole evidence rule only applies to contractual disputes between the two parties to the contract. The parole evidence rule would not preclude the court from considering the testimony of Mr. Hall or Mr. Parada on the installation and the ownership of the lease. And because this was mentioned in their reply, I did not have an opportunity to mention cases that are in support of what I'm telling the court. And there's a general casualty case. It's 8-0. Did you previous to oral argument give Ms. Dowd copies of the sites you're going to give us? I did not give Ms. Dowd these sites. In the future, I would suggest you do that. Okay. Thank you, Your Honor. I will follow your instruction. But general casualty, 8-0 at 3rd, 215. And also, Rosalind Lexington v. Lexington, 2014 I.L. App, 1st District, 113755, paragraph 94. And the holdings in those cases are that the parole evidence rule only applies in breach of contract actions between the parties to the contract. But the parole evidence rule does not apply between a party to the contract and a stranger. And plus, they waived this issue because they never brought up the parole evidence rule before the lower court to make a ruling on it. Thank you. I'm sorry. There are no further questions. And your time is up. Okay. Thank you. And I ask this court to, again, affirm the lower court's decision. Thank you. Ms. Fowley, you may proceed with the rebuttal. Thank you, Your Honor. I'd like to make four points. Number one, this alleged ownership by Mr. Hall in 2003 is news to everyone. There's nothing in the record to support that. And to the contrary, in counsel's brief on page 2 and in the record, He states Hall admitted that he is the owner of the premises located at 24125 111th Street, Naperville, and that he is the landlord for the tenant space occupied by Plaintiff's employer, Sparks Complete Car Care, citing page 148 in the record. Nothing in the record to substantiate that. Was there a date that he justified to relative to when he became owner? He was questioned at his deposition with respect to all relevant times, and he never clarified that he was not the owner during his deposition. He said he was the owner. On cross-examination, counsel never corrected that. So that's a problem. Second, I refer the court again to pages C1369 in the record, Mr. Hudson's testimony, where he delineates the applicability of the International Building Code, the 2012 and the 2000, the 2012 and 2000 International Property Maintenance Code, and the standards that expressly applied to lifts. It's very important in this case, Your Honor, and I don't think it should be dispositive whether it's the Will County Code or the Naperville Code. The bottom line is in both codes these standards applied, and this was the law in effect. I think counsel's point was, though, that there's no evidence in the record showing that the codes were part of any ordinance in 2001. That's incorrect, Your Honor, because in the two experts' deposition or affidavits, they cite both sections, both times of the code, and they specifically state that there were no material differences with respect to those when it was amended in 2012 or thereafter, and they provided... But what about 2001, when the lifts were installed? They cited that code, and they provided those provisions for the court's convenience, but also... But the codes were part of the ordinance at that time? Yes, and that's expressly in their affidavits, and they asked the court to take judicial notice of the applicable law and codes, and that's mandated by statute. It's not something that an expert has to bring in a foundation. I mean, I can't... I've never in my career heard of anyone having to bring a certified copy of a law in to a courtroom. I mean, the law is the law. You know, yes, we cite it. The court looks it up. We verify it. We argue. This was never argued. This was never refuted. Counsel never refuted any of this, and this is delineated in both... It would be helpful if it was certified, but I think that the minimum would be to ask the court to take judicial notice of it and provide a copy so that if it exists, the copy would assist whatever governmental agency or entity could locate and affirm, if necessary, that this was the case. And what happened here, Your Honor, the experts provided copies of those provisions from the codes upon which they relied in their affidavits. From two sides of one? Yes. They cited all the provisions relevant. And they cited the provisions, and in his affidavit, of his cited provisions, he said there was no difference between the two. That's in there. And plaintiff's counsel also, at the hearing, asked the court to take judicial notice of these laws and these standards. And Mr. Hall cannot get around the expert opinion that he deviated from these standards that applied expressly to an owner. What is your response to opposing counsel's statement that Naperville had its own standards and that the situation was such that the Will County ordinance is only applied in unincorporated areas of Will County as opposed to being supreme throughout the county? Well, first of all, again, I submit. I'm sorry. I submit, Your Honor, that the law, the Naperville ordinances, with respect to the building codes, are no different from Will County's. They're the same international building code, international electric code, international property management code. And had the counsel never refuted the law that applied below, had an issue been brought to anyone's attention, a correction could have been made. But the law is the law. If we can inform on any basis supported by the record, we would agree with that. Yes, sir, and that includes what law applied at this time and therefore what were the legal obligations of Mr. Hall. Counsel, you said you had four points. I only counted two so far. Last, with respect to the leases, without even seeing the case as counsel cites, I submit he's incorrect, that parallel evidence is admissible here. The essential issue, this is black-letter law, what did the leases say? And as we pointed out, we had different entities on the 2001 lease as opposed to the 2011 and the 2016. What they said is what they said. At that time, Mr. Hall took protections. He wanted to make sure there were no alterations, and he protected himself. If you do it, it's my property. Whether he ever exercised that right and sold it as auction is a separate issue. But legally, legally he became the owner, and that's a separate theory of why he had a responsibility to maintain that equipment. Is that the third and fourth or just the third? Well, I kind of lost count. Oh, the fourth one was with respect to the expert testimony on the lifts. Mr. Heath testified that the lifts were bad for at least five years. So there is a foundation. It wasn't just this post-occurrence inspection. But we also have Ms. Cazares' testimony where she said these lifts were horrible, pads were missing, a car fell off the lifts before this incident, and that the workers were constantly sticking in brake pads trying to make these lifts stable. So there's genuine issues of material fact with respect to the condition of the lifts. The fact that something fell off of a rack doesn't necessarily mean that the rack is defective. It could have been installed defectively. The rack, put another way, the way in which it was maintained or the way in which the car was placed on the rack, because as I understand it, this had extendable arms or appendages that tried to place pads in locations where the pads would support the structure or the infrastructure of the vehicle such that the vehicle would not either implode or collapse and fall off the rack because of the improper placement of the pads underneath the vehicle. Am I correct? Put another way, was there any investigation to indicate what the cause of the car falling off of the rack was? Yes. What was it? Mr. Heath performed an examination. Mr. Perita did not. There's no evidence of any inspections he performed. Nothing was produced during discovery throughout his ownership. And there's actual witness testimony that it's not, okay, fine, I agree that they were not properly maintained, but the fact that workers had to stick brake pads into these corners, two of the four corners to maintain balance, and that the plaintiff had to do it that day indicates that these were defective. That is not how these lifts were supposed to exist. They were supposed to have the proper supports, the proper arms, and it's quite extensive, Your Honor, as far as Mr. Heath delineating all the problems with this. I refer the Court to pages 1372 through 1374. There's three pages where he details everything that was wrong, everything that he found.  I mean, parts are missing from the swing arm restraints. There's no record. The violations are just overwhelming. I could go through them all, but, you know, if you'd like me to, I would. But they're detailed. There's 20 paragraphs of violations. We were primarily going back with Justice Kennedy's question of what your four points were. Not necessarily a full explanation of what the inner arguments or sub-arguments were relative to those four points. Okay. My four points were that the 2003 ownership is not of record, that Mr. Heath's testimony did have a proper foundation and was valid along with the other witness' testimony with respect to the lifts. That's the second one. And then, regardless of which ordinance applies, the law is the same. The law was the law, and that imposed a legal duty on the defendant to have maintained the premises and the equipment in good condition. And then lastly, counsel's arguments about the leases and apparel evidence are manifestly incorrect. The leases speak for themselves, and this Court will interpret those leases. Okay. Thank you. We will take the case under advisement. Thank you very much. There's another case in the call. We'll take a short recess.